1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    REX CHAPPELL,

11              Plaintiff,                    No. CIV S-03-0653 GEB KJM P

12         vs.

13    R. MANDEVILLE, et al.,

14              Defendants.              <u>FINDINGS & RECOMMENDATIONS</u>

15    _____/

16              Plaintiff is a California prisoner proceeding pro se with an action for violation of

17    civil rights under 42 U.S.C. § 1983.  He alleges numerous violations of the Eighth and

18    Fourteenth Amendments to the Constitution.[1]  The defendants' motion for summary judgment is

19    before the court.

20    /////

21    /////

22    /////

23    _____

24         [1] The amended complaint also alleges state law claims against the defendants, all of
      whom were at the relevant time employees of the California Department of Corrections and
25    Rehabilitation (CDCR).  By order of May 19, 2005, the court ruled that plaintiff could not
      proceed with those claims because he had not alleged compliance with California's Tort Claims
26    Act.  <u>See</u> Order, Docket Entry 30.

                                         1

I.     Standard of Review for Summary Judgment

Summary judgment is appropriate when the movant demonstrates that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the

2

dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute is genuine, i.e., that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

On September 15, 2005, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

II.    Factual Background

At the time of the incident giving rise to this lawsuit, plaintiff was a prisoner at California State Prison-Sacramento (CSP-Sac). Defendant Mandeville was Captain of the Investigative Services Unit (ISU) at CSP-Sac. See Defs.' Ex. H ¶ 1.[2] Defendant Rosario was the Acting Warden. See Defs.' Ex. I ¶ 4. The other defendants were lower-level officers at the prison.

On April 28, 2002, plaintiff received a visit from his fiancée, Philissa Richard. See Pl.'s Ex. A. Ms. Richard arrived wearing a hairpiece in the shape of a ponytail. See id. A correctional officer observed Ms. Richard wearing the hairpiece and asked her to remove the bobby pins from it. See Pl.'s Ex. B (Letter of June 10, 2002). Ms. Richard complied, but it appears she was allowed to enter the visiting facility with the hairpiece despite prison rules to the contrary. See id. (Letter of August 19, 2002).

The following day, April 29, ISU was informed that the hairpiece had been found in a trash can near the visiting area.[3] See Pl.'s Ex. B-1. The discovery precipitated an emergency institutional count. See id. The visiting area was searched, and some spandex undergarments were discovered in the women's restroom. See Pl.'s Ex. B-1 at 1. The hairpiece and undergarments were subjected to an Ionscan test on April 30. Id. On both items, the test

---

[2] The court refers to the exhibits attached to the motion for summary judgment as "Defs.' Ex. ___." The court refers to the exhibits attached to plaintiff's opposition to the motion for summary judgment as "Pl.'s Ex. ___."

[3] Ms. Richard would later acknowledge in a letter to Acting Warden Rosario, "I threw the hairpiece in the garbage can...." Pl.'s Ex. A (Letter of May 20, 2002). However, the investigation that followed the discovery of the hairpiece and the undergarments "did not conclude that the women's undergarments belonged to Ms. Richard." Id., Ex. B-1 at 2.

returned an initial positive "alarm" for cocaine residue. Defs.' Ex. A, Attach. A at 3. A background check of Ms. Richard revealed that she possessed two California driver's licenses and had "a long well documented history of felony and misdemeanor infractions." Pl.'s Ex. B-1 at 1. The prison's visiting records, surveillance video of visitors and interviews with prison staff linked the hairpiece to Ms. Richard and Ms. Richard to plaintiff. Defs.' Ex. A ¶ 10; Pl.'s Ex. A.

As a result of the investigation, plaintiff was placed on contraband watch beginning April 30, on suspicion of secreting contraband in his digestive system. Defs.' Ex. A ¶ 12 & Ex. I ¶ 2. Defendant Mandeville, as ISU Captain, was in charge of the investigation. Mandeville denies he was the official who ordered the contraband watch. See Defs.' Ex. H ¶ 3. Mandeville states that his function was only "to conduct investigations and provide the information to facility staff to take appropriate action." Id. According to the defendants,

> CSP-Sac's contraband watch procedures require that the decision
> to place an inmate on contraband watch be made by a prison
> official of the rank of Captain or above. Normally, the decision to
> place an inmate on contraband watch is made by high level
> officials in the facility where the inmate is housed. The official
> placing an inmate on contraband watch must notify the Warden's
> office of the placement.

Defs.' Statement of Undisputed Facts No. 21 (referencing Defs.' Ex. B ¶ 3 & Ex. H ¶ 3). It is undisputed that defendants Mandeville and Rosario both had the authority to place plaintiff on contraband watch. However, the record is inconclusive as to the identity of the prison official who actually made the decision to do so.

Plaintiff was told of the discovery of the hairpiece on the night of April 29, the same day he received the visit from Ms. Richard. See Chappell Dep. Tr. (Defs.' Ex. L) at 21:16-22:9.[4] He was therefore apprised of the reason for his placement on contraband watch when his confinement there began the next day.

---

[4] A condensed copy of Chappell's deposition transcript is attached to the motion for summary judgment as Defs.' Ex. L. While this copy is not certified, plaintiff has not objected to its use. Moreover, the court generally does not rely on the deposition's contents to recommend a grant of summary judgment.

Contraband watch[5] is a special, temporary confinement used to determine whether an inmate has ingested or secreted contraband in his digestive tract and, if so, to recover it. The affidavit of Officer Hill, an associate warden of health care at CSP-Sac, describes the procedures and conditions of contraband watch at CSP-Sac in 2002:[6]

> . . . The inmate is placed in a secure cell where he can be closely monitored by custody staff, and his bowel movements can be searched. Once he has passed several bowel movements free of contraband staff can reasonably infer he does not have contraband in his digestive system, and he can be released from contraband watch.
>
> . . . .
>
> Contraband procedures at CSP-Sacramento in 2002 were as follows. Before placement on contraband watch the inmate was thoroughly searched. Once searched, the inmate was placed in two pair of underwear, one worn correctly, the other placed on backwards. The underwear were then taped at the waist and thighs in such a way that the tape does not touch the skin. The inmate was then placed in two jumpsuits, one correctly, the other backwards. The jumpsuits were then taped at the thighs, ankles, waist and upper arms, in such a way as not to touch the skin. The purpose of the taping is to shut off the openings of the clothing to prohibit the inmate from excreting contraband or moving it around in his clothing.

[5] This procedure is alternately referred to as "Body Cavity Surveillance" or "body cavity search," Pl.'sMarch 31, 2009 Ex. J, or the prison vernacular, "potty watch."

[6] Plaintiff offers an excerpt of the CDC Operations Manual as proof of the conditions and procedures when he was on contraband watch, and the defendants have not objected to its accuracy. See Pl.'s Ex. I. However, the document submitted by plaintiff is from CSP-Sac's supplement to the Manual that was being used in March 2005, nearly three years after he was placed on contraband watch in April 2002. Defendants provided plaintiff this document as a response to a request for production regarding the so-called "10 rules of contraband watch" that were allegedly displayed near the contraband watch cell in 2002. Defendants responded that "the rules for contraband watch at [CSP-Sac] have changed over the last four years... the sign is no longer available." Pl.'s Ex. I (No. 3). Plaintiff claims that one of the ten rules gave him the option to request an x-ray in lieu of an extended stay in the contraband watch cell, an option that he tried to exercise. See Am. Compl. at 23; see also Opp'n at 31. Officer Hill states in his affidavit that he is "not aware of any rule or regulation requiring prison officials to permit an inmate to consent to an x-ray in lieu of providing contraband-free bowel movements on contraband watch." Defs.' Ex. B ¶ 11. The 2005 supplement does state that "[w]ith the inmate's consent, an x-ray may be taken by a qualified x-ray technician to affirm the presence of some specific types of contraband," suggesting that as of 2005 an x-ray was an option but not subject to an inmate's discretion. Pl.'s Ex. J at 1.

Once clothed, the inmate was placed in waist chain restraints. Waist restraints are commonly used in prison, as for example when an inmate is being transported. In the waist restraints used for an inmate on contraband watch, the inmate wears handcuffs that are separated and chained to [the] side of his waist. The purpose of this type of restraint is to keep the inmate's hands close to his waist, and to prevent the inmate from being able to reach his rectum. These restraints were kept on for the duration of the contraband watch. However, the restraint connecting the handcuffs to the waist chain was adjustable so that custody staff could lengthen the restraint approximately 6 inches to permit the inmate greater range of motion when reasonably necessary, for example, when the inmate was eating meals.

The inmate was then placed in the contraband watch surveillance cell.... No mattress or other furniture was allowed in the cell to prevent the inmate from concealing contraband, but the inmate was permitted to have a blanket on the bed.

At least one custody staff member was assigned to constantly observe the inmate on contraband [watch] at all times. The observation was direct and constant, to prevent the inmate from disposing of contraband.

The cell did not contain a toilet or running water. When the inmate needed to defecate he notified custody staff who brought him a chair lined with plastic, similar to the type of moveable toilet used in a hospital. The chair consisted of an aluminum frame with a plastic-lined bucket underneath the seat. Once the inmate had used the chair custody staff removed the plastic and searched the waste to determine if it contained contraband.

During contraband watch staff must be able to see the inmate at all times. Therefore, the lights were kept on at all times.

Inmates on contraband watch received the same food as all other inmates. Therefore, the inmate on contraband watch received three meals a day, with a beverage.

Defs.' Ex. B ¶¶ 2, 4-10.[7]

/////

---

[7] This description of conditions in 2002 is mostly consistent with the one laid out in CSP-Sac's 2005 Supplement to the CDC Operations Manual, except for the constant illumination and lack of a mattress. There is no written provision dictating those conditions anywhere on record. Also, plaintiff does not state he was removed from the cell every two hours and the cell searched, as provided in the supplement. See Pl.'s Ex. J.

During his contraband watch, plaintiff complained about the tape around his jumpsuit. <u>See</u> Defs.' Ex. E ¶ 5. The sergeant responsible for the contraband watch facility states that he checked the tightness of the taping himself and offered to have medical staff check plaintiff but plaintiff refused. <u>See id.</u> ¶¶ 5-6. Plaintiff does not dispute that the tape was checked and that he refused medical attention for it. <u>See</u> Opp'n at 16. However, on May 3, plaintiff did receive medical attention for his complaint that the wrist and leg cuffs were too tight. The nurse who examined him recorded that he had an "indentation on the right wrist cuff" and that his right ankle was "swollen." Pl.'s Ex. M. The nurse referred him for examination by a doctor. <u>See</u> <u>id.</u> However, there is no record or statement from either party as to whether any follow-up examination occurred.

On May 2, plaintiff was ordered to submit to a urinalysis test, but he refused to comply. <u>See</u> Pl.'s Ex. Q at 1; Defs.' Ex. L at 50:22-51:21. He was reported for a rules violation and brought up on disciplinary charges for his refusal. Pl.'s Ex. Q. The rules violation report, submitted by Defendant Rasmussen, states that "Chappell was ordered to submit to urine analysis as a result of cocaine residue being discovered on panty hose and a wig belonging to Chappell's visitor...." <u>Id.</u> at 2-3. The charge was later dismissed "in the interest of justice" and plaintiff found not guilty after Rasmussen admitted that "he did not write, nor was he familiar with information relating to Chappell's visitor having residue on panty hose or wig." <u>Id.</u> at 5. The order of dismissal carries a "Special Notation: There was not evidence submitted for the hearing to satisfactorily explain the circumstances surrounding the charges." <u>Id.</u>

Plaintiff remained on contraband watch until May 6 (roughly seven days total), after having three bowel movements that revealed no contraband. <u>See</u> Defs.' Ex. I ¶ 2. On May 6, he was given an x-ray that concluded there was "[n]o foreign body... in the lower abdomen." Pl.'s Ex. L. The radiology report states that the reason for the x-ray was a "[c]avity search." <u>Id.</u>

/////

/////

III.　Analysis

Defendants seek summary judgment of the following claims: (1) that defendants Mandeville and Rosario subjected plaintiff to conditions of confinement on contraband watch that were cruel and unusual, in violation of the Eighth Amendment; (2) that Mandeville and Rosario violated plaintiff's right to due process in placing him on contraband watch; (3) that defendants Mandeville, Rosario, Rasmussen, Davis and Case fabricated a disciplinary report against plaintiff, in violation of his right to due process; (4) that defendant Rosario violated plaintiff's right to due process when he suspended the visitation privileges of plaintiff's fiancée; and (5) that defendant Rodriguez harassed, "stalked" or otherwise interfered with plaintiff's fiancée outside the prison.

A.　Eighth Amendment Claims

Plaintiff alleges defendants Mandeville and Rosario violated his rights under the Eighth Amendment while he was on contraband watch. Specifically he alleges his confinement involved "the unjustified and penologically unnecessary taping up of plaintiff... until blood circulation was cut off.... Also plaintiff was chained with . . . shackles . . . so tight that plaintiff's [w]rists bled and both [w]rists and ankles swelled to a point of deformity...." Am. Compl. at 23:10-15. He also alleges his constitutional rights were violated when he was refused an x-ray before and during his confinement to contraband watch, "even though one of the 10 rules of contraband watch says it's an alternative." Id. at 23:19-24:6. Throughout his amended complaint and his opposition to summary judgment he attacks the conditions and practice of contraband watch generally, characterizing them as "cruel and unusual," "illegal" and "barbaric." See, e.g., id. at 10; Opp'n at 21. At one point, he claims the conditions of contraband watch "did in fact torture plaintiff mentally being taped up, shackled, and lying on a metal bed, with the bright light on 24 hrs a day." Am. Compl. at 21:7-9.

The motion for summary judgment attacks the factual basis of plaintiff's Eighth Amendment claim on two grounds: (1) prison officials had reasonable suspicion to place plaintiff

on contraband watch, and (2) the conditions of plaintiff's contraband watch did not violate the Eighth Amendment.  Defs.' Mem. P. & A. In Supp. Summ. J. (MSJ) at 11-12.

Regarding defendants' insistence they had a reasonable suspicion to place plaintiff on contraband watch, "reasonable suspicion" is a defense to a Fourth Amendment claim of unreasonable search and seizure, not a claim of cruel and unusual punishment.  In asserting the "reasonable suspicion" defense, defendants rely on a case involving a challenge to Washington's contraband watch procedure, <u>Mendoza v. Blodgett</u>, 1990 WL 263527 (E.D.Wash. 1990).  A close reading of that case, however, shows that the Washington district court's "reasonable suspicion" analysis drew on principles of Fourth Amendment precedent involving visual and digital body cavity searches that were challenged in a prison setting.  The court used that analysis to address the plaintiff's express argument that prison officials put him on contraband watch without reasonable suspicion that he had ingested contraband, apparently accepting without question that the plaintiff's "reasonable suspicion" theory presented a pertinent inquiry under the Eighth Amendment.  The <u>Mendoza</u> plaintiff only appealed the due process issues he had presented to the district court, and the Ninth Circuit's review and affirmation of the district court's <u>Mendoza</u> decision does not discuss the questionable relevance of "reasonable suspicion" to his Eighth Amendment claim at all.  <u>See</u> <u>Mendoza v. Blodgett</u>, 960 F.2d 1425 (9th Cir. 1992).

Other than the district court's opinion in <u>Mendoza</u>, there is no authority for grafting a defense of "reasonable suspicion" onto a claim challenging the conditions of confinement under the Eighth Amendment.  Plaintiff in this case does say the conditions to which he was subjected were "unjustified and penologically unnecessary," or were inflicted "with not so much as a good reason," language that in some contexts might echo an argument that the defendants had no reasonable suspicion to put him on contraband watch.  But he uses that language to invoke his Eighth Amendment right against cruel and unusual punishment.  Am. Compl. at 23; Opp'n at 3.  He does not go so far as to allege an improper search and seizure in

violation of the Fourth Amendment, and even a liberal construction of his claims does not support such a reading.  The court thus analyzes the Eighth Amendment claim with reference to the well-established precedent applicable to such a claim.

"[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  A plaintiff who claims that the conditions of his confinement fall below the constitutional standard must make two showings.  "First, the plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious' to form the basis for an Eighth Amendment violation."  Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000) (citation omitted). "The Constitution... 'does not mandate comfortable prisons, and only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation."  Wilson v. Seiter, 501 U.S. 294, 298 (1991) (citations omitted).  Second, the prisoner must make a "subjective" showing that prison officials "acted with the requisite culpable intent such that the infliction of pain is 'unnecessary and wanton.'  In prison conditions cases, prison officials act with the requisite culpable intent when they act with deliberate indifference to the inmate's suffering."  Anderson v. County of Kern, 45 F.3d 1310, 1312 (9th Cir. 1995).

1.   The objective component: whether contraband watch was a sufficiently serious deprivation

To make the required objective showing that the conditions of contraband watch were "sufficiently serious" to support an Eighth Amendment claim, plaintiff needs to present evidence of an "excessive risk to inmate health or safety."  Farmer, 511 U.S. at 837.  The risk must be shown in a specific deprivation of a basic human necessity.  "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists."  Wilson, 501 U.S. at 304-05.  "To the extent that

such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). "[E]xtreme deprivations are required to make out a conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992).

The nature of the deprivation and the duration of plaintiff's stay on contraband watch are also factors in the court's analysis. "'The more basic the need, the shorter the time it can be withheld.'... More modest deprivations can also form the objective basis of a violation, but only if such deprivations are lengthy or ongoing." Johnson, 217 F.3d at 731-32 (citations omitted). "Prison officials must provide all prisoners with adequate food, clothing, shelter, sanitation, medical care, and personal safety.... The longer the prisoner is without such benefits, the closer it comes to being an unwarranted infliction of pain. Hoptowit v. Ray, 682 F.2d 1237, 1258 (9th Cir. 1982).

Here, plaintiff's stay on contraband watch lasted between six and seven days. Defendants argue that "[b]ecause the Plaintiff received adequate food, shelter, and medical care, and because he was on contraband watch for less than a week, the conditions of his confinement did not violate the Eighth Amendment." MSJ at 13. The undisputed evidence shows he was provided with his regular medication and referred to a nurse when he complained about his wrist and leg restraints being too tight. See Defs.' Ex. D at 6-7; Pl.'s Ex. M. Plaintiff does not specifically aver that the conditions of contraband watch were unsanitary or posed a risk to his physical health or safety.

Plaintiff also does not allege any causal connection between the taping and tight handcuffs and defendants Mandeville and Rosario. Am. Compl. at 24:1-2. Plaintiff does allege these defendants had some control over his placement on contraband watch, and indeed Mandeville and Rosario each held a supervisory rank that authorized them to put a prisoner there. However, their supervisory ranks do not make them liable for a subordinate's use of excessive force. See Hansen v. Black, 885 F.2d 642, 645-46 (9th Cir. 1989). When a named

defendant holds a supervisory position, the causal link between that defendant and the claimed constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1978).  Plaintiff must allege and have evidence to support a claim that the defendant either participated personally in the alleged deprivation, knew of the violations and failed to act to prevent them, or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" Hansen, 885 F.2d at 646 (citations omitted); see also Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Because there is no evidence that Mandeville and Rosario knew about or participated in the taping or placing excessively tight cuffs on plaintiff, they cannot be held liable for any violation that accrued as a result of this particular set of actions.

Plaintiff is specific about the excessive risk the conditions of contraband watch posed to his psychological health:  Plaintiff states he "was deteriorating mentally" because defendants "did in fact torture plaintiff mentally being taped up, shackled, and lying on a metal bed, with the bright light on 24 hrs. a day." Am. Compl. ¶ 39.  A claim for psychological suffering is cognizable under the Eighth Amendment.  See Jordan v. Gardner, 986 F.2d 1521 (9th Cir. 1993).  "Mental torture is not an oxymoron, and has been held or assumed in a number of prisoner cases ... to be actionable as cruel and unusual punishment." Thomas v. Farley, 31 F.3d 557, 559 (7th Cir. 1994).  Irregular lighting (that is, either too much illumination or not enough) has been held to be a deprivation of a basic necessity that can, under some circumstances, violate the Eighth Amendment.  "There is no penological justification for requiring inmates to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996).  Furthermore, "access to a bed is an integral part of the 'adequate shelter' mandated by the Eighth Amendment.... [P]risons may not deprive those in their care of a basic place to sleep...." Thomas v. Baca, 514 F.Supp.2d 1201, 1216 (C.D. Cal. 2007).  Although some courts have held outright that a mattress is by itself "a basic human need," Oladipupo v. Austin, 104. F.Supp.2d 654, 660

(W.D. La. 2000), the majority of decisions citing the lack of a mattress have done so in addressing a combination of deprivations that together were unconstitutional.  See, e.g., Sellars v. Beto, 409 U.S. 968, 969 (1972) (solitary confinement twenty-four hours a day, only fed bread and water, no mattress); Rodgers v. Thomas, 879 F.2d 380, 385 (8th Cir. 1989) (no toilet or sink, clothing confiscated, only allowed to shower once every five days, no mattress).[8]  Indeed the Supreme Court has stated, in Wilson v. Seiter, that deprivations that by themselves might not support a claim can, in a narrow category of cases, combine to create a constitutional violation under the Eighth Amendment:

> Some conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets.

Wilson, 501 U.S. at 304-05 (emphasis in original).

Plaintiff's description of the conditions he experienced on contraband watch, which is not disputed, falls under the Wilson category of mutually enforcing conditions that produce a single deprivation.  Although plaintiff does not use the term "sleep deprivation," he

---

[8] On the other hand, some district courts in the Sixth Circuit have recently followed that court's opinion that "[a]bsent evidence that plaintiff suffered a physical injury, deprivation of a mattress, blankets, or other bedding for a fixed period of time, such deprivation does violate the Eighth Amendment."  Washington v. Johnson, 2009 WL 73676 at *10 (E.D. Mich.).  No such rule has emanated from the Ninth Circuit, however.  The failure to provide a mattress for a single night has been held to pass constitutional muster, Hernandez v. Denton, 861 F.2d 1421, 1424 (9th Cir. 1988), vacated on other grounds and remanded, 493 U.S. 801 (1989), but there is no clear guidance as to how much time must pass before the lack of a mattress becomes a constitutional violation.  District courts across the country are very much divided on the issue.  See, e.g., Morrison v. Martin, 755 F.Supp 683, 686 (E.D.N.C. 1990) (vague allegation of no mattress does not state a claim under 42 U.S.C. § 1983); Blackmon v. DeRobertis, 1989 WL 31059 (N.D. Ill.) (no mattress or blanket for four days, plus other unsanitary conditions, did not state Eighth Amendment claim); Lee v. Carlson, 645 F. Supp 1430, 1436 (S.D.N.Y. 1986) (placement in holding cell for four days without mattress or blanket may state Eighth Amendment claim), abrogated on other grounds, 77 F.3d 672 (2nd Cir. 1996); O'Connor v. Keller, 510 F.Supp. 1359, 1372 (D.Md.1981) (48 hours in isolation without mattress or blanket states Eighth Amendment claim).

specifically alleges his mental health worsened over seven days because of conditions that, combined, would deprive a person of sleep. The failure to provide an inmate adequate sleeping conditions can, under some circumstances, violate the Eighth Amendment. See Harper v. Showers, 174 F.3d 716, 720 (5th Cir. 1999) (stating that "sleep undoubtedly counts as one of life's basic needs. Conditions designed to prevent sleep, then, might violate the Eighth Amendment").

Defendants, who bear the burden of showing there is no genuine issue of material fact for trial, give this aspect of the complaint scant discussion. Their motion does state there was no mattress because it could be a place for "concealing contraband" and that "staff must be able to see the inmate at all times. Therefore, the lights were kept on at all times." MSJ at 6:20-7:4; Defs.' Ex. B ¶¶ 7-9. Given that plaintiff has alleged a risk of psychological harm in these methods, it is incumbent on defendants to show that deprivation of basic sleeping conditions is not a measure "without penological justification." Rhodes, 452 U.S. at 346 (citation omitted). Without more discussion than defendants have provided, the court cannot accept defendants' conclusory justification for the potentially sleep-depriving methods of contraband watch as a basis for summary judgment. See Johnson v. California, 543 U.S. 499 (2005) (citing Spain v. Procunier, 600 F.2d 189, 193-94 (9th Cir. 1979) (for proposition that "[m]echanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary")).

The court is not unmindful of the balance that must be struck between prison security and prisoners' constitutional rights, nor does it doubt the veracity of defendants' contention that "[t]he presence of illegal street drugs in California prisons is a major threat to the safety of both inmates and prison staff." See MSJ at 3. However, on the present record, there is no apparent connection between that safety interest and depriving this plaintiff of adequate sleeping conditions. Cf. Thomas, 514 F.Supp.2d at 1218 ("[p]risons have a legitimate interest in 'maintaining security and order at the institution,' and they may impose restrictions that are

reasonably related to that interest.  However... access to a bed is a fundamental human necessity under the Eighth Amendment.  A restriction that violates that constitutional floor cannot possibly be reasonable....").  While other aspects of contraband watch – the six-inch waist and ankle chains, the doubled clothing, the closely-observed bowel movements – are self-evidently tailored to the purpose of contraband watch, the necessity of depriving a prisoner of a mattress and putting him in constant lighting for seven days is not so evident.

For the purposes of summary judgment, defendants have not adequately addressed plaintiff's claim that he was psychologically affected by the combination of deficient bedding, constant illumination and heightened restraint in a small room for seven days.[9]  See Thompson v. City of Los Angeles, 885 F.2d 1439, 1448 (9th Cir. 1989) (reversing a grant of summary judgment in part because the plaintiff's "allegations with respect to his sleeping conditions pass without reference or acknowledgment in the County's brief").  Therefore there remain genuine issues of material fact with respect to the objective component of the Eighth Amendment claim.

/////

/////

---

[9]  Defendants have addressed another argument plaintiff emphasizes throughout his pleadings – i.e., that defendants violated the Eighth Amendment by refusing to x-ray his abdomen in lieu of placing him on contraband watch.  Defendants have submitted a medical opinion that an x-ray would not be conclusive as to the existence of drugs in plaintiff's digestive tract.  See Defs.' Ex. G ¶ 4.  Plaintiff tries to rebut this expert opinion with his own interpretation of the findings of the x-ray taken after his contraband watch was terminated, but his lay opinion does not create a material dispute on the inconclusiveness of an x-ray in detecting "a small parcel containing drugs."  Id.  He also does not provide evidence of the so-called "10 Rules of Potty Watch" he alleges were displayed outside the contraband cell and that supposedly gave the prisoner the irrevocable option of having an x-ray taken in order to avoid contraband watch altogether.  Instead, as previously noted, the rules of contraband watch in the CDC Operations Manual, which plaintiff has provided as his own exhibit, describe the x-ray option as something permissive, not mandatory, that "may be taken... to affirm the presence of specific types of contraband."  Pl.'s Ex. J (emphasis added).  This description of the x-ray policy is consonant with the expert's statement that x-ray is useful for detecting metal objects secreted in the human alimentary canal but that "non-metal objects... are not always visible through standard x-ray technology."  Denial of the x-ray did not contribute to conditions that were "sufficiently serious" to violate the Eighth Amendment.

2. The subjective component: deliberate indifference

The Supreme Court has defined the subjective prong of an Eighth Amendment claim to mean that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. Plaintiff here repeatedly avers that defendants took action against him "maliciously and sadistically" in retaliation for previous disputes with the ISU and for insulting defendant Mandeville's professionalism, an allegation that posits an even higher level of culpability than necessary to state his claim. Am. Compl. at 12, 14, 20 and 24; see also Pl.'s Ex. O (Affidavit of Louis V. Hayes) (alleging "Mandeville said let him sit there and suffer").[10]

Thus, "it remains open to the officials to prove they were unaware even of an obvious risk to inmate health or safety." Farmer, 511 U.S. at 844. Defendants' motion, however, lacks any discussion of their state of mind: critical questions of what risk they perceived and when they perceived it, or what steps they took to abate it, are neither addressed nor answered.[11] Neither defendant says he did not know about the conditions of contraband watch when plaintiff was put there. Given these defendants' high ranks within the prison and their authority to place a prisoner on contraband watch, at this stage of litigation and on this record, the reasonable inference in favor of plaintiff must be defendants knew what the

---

[10] Defendants have objected to Hayes' affidavit on an issue that does not undermine the court's reliance on it here. Also, the defendants have not moved to strike the affidavit as defective summary judgment evidence, which is the procedure required by the Ninth Circuit to object to the admissibility of summary judgment evidence. See Fireguard Sprinkler Systems, Inc. v. Scottsdale Ins. Co., 864 F.2d 648, 651 n.2 (9th Cir. 1988).

[11] The closest thing to a statement of defendants' knowledge of the conditions of contraband watch is defendant Mandeville's statement he did not order plaintiff to be put on contraband watch, and defendant Rosario's statement he does not remember if he was the official who ordered the contraband watch or not. See MSJ at 15; Defs.' Ex. H ¶ 3 & Ex. I ¶ 3. These statements, however, are responsive to plaintiff's due process claim, not the Eighth Amendment claim.

conditions of contraband watch were in 2002.[12]

The motion for summary judgment of plaintiff's Eighth Amendment claim should be granted as to the application of excessive force in the form of too-tight shackling and taping, but otherwise denied.

B.    Due process

Plaintiff alleges violations of his right to due process on three grounds: (1) that he was "not told why he was placed on contraband watch, and given absolutely no notice"; (2) that the defendants "fabricate[d] a C.D.C.115 [disciplinary report] in [an] attempt to justify subjecting plaintiff to cruel and unusual punishment;"[13] and (3) that his visiting rights were taken away "with absolutely no evidence of any wrongdoing, and no documents naming anything plaintiff had done." Am. Compl. at 21-23, 26, 28.

1.    Plaintiff had a liberty interest in avoiding contraband watch

The Due Process Cause protects against the deprivation of liberty without due process of law. See Wolff v. McDonnell, 418 U.S. 539, 556 (1974). In order to invoke the protection of the Due Process Clause, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. Generally, liberty interests may arise from the Due Process Clause itself or from state law. See Wilkinson v. Austin, 545 U.S. 209, 222 (2005). The Due Process Clause does not confer on prisoners a liberty interest in avoiding more adverse

_____

[12] Rosario says in his affidavit that even though he cannot remember if he ordered plaintiff onto contraband watch, "[i]f I was apprized [sic] of facts giving rise to a suspicion that Chappell was secreting drugs before he was actually placed on contraband watch, I would certainly have ensured he was placed on contraband watch immediately." Defs.' Ex. I ¶ 3.

[13] The allegation of a fabricated or falsified disciplinary report appears in the statement of facts of the amended complaint and as the basis of one of the state law claims disallowed by the court's screening order (see docket entry 30). Plaintiff does not place the filing of a false disciplinary report under his claim labeled "due process and equal protection." Still, the screening order allowed process to be served on defendants Rasmussen, Davis and Case, and the only factual averment against them involves the alleged fabrication of a disciplinary report against plaintiff. The court reads the pro se complaint as claiming a due process violation under these facts, and the defendants have presented it for summary judgment under a due process analysis.

conditions of confinement.  See Wilkinson, 545 U.S. at 221.  A court determines whether a

liberty interest is created by a state prison regulation or policy by focusing on the nature of the

deprivation it effects.  See Sandin v. Conner, 515 U.S. 472, 481-84 (1995).  Liberty interests

against adverse conditions of confinement are a narrow category, limited only to the freedom

from any restraint that "imposes atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life."  Sandin, 515 U.S. at 484.

As a threshold matter, defendants argue first that "[c]ontraband watch is not an

atypical or significant hardship of confinement because it is merely a temporary security

measure."  MSJ at 14.  Defendants provide no authority for the proposition that a temporary

deprivation cannot be a "significant hardship," and they do not address authority finding that

contraband conditions equivalent to those in this case imposed an "atypical and significant

hardship."  Addressing another method of detecting contraband, the Ninth Circuit in Mendoza v.

Blodgett found a prisoner's "private interests were substantially affected by the dry cell watch."

Mendoza, 960 F.2d at 1430.  Although the Sandin standard for determining a prisoner's liberty

interests had not been articulated at the time of the decision in Mendoza, the Ninth Circuit's

characterization of "private interests... substantially affected" is persuasively similar to the case

presented here.  The court thus finds that plaintiff had a liberty interest in avoiding the restraints

of contraband watch.

2.     The process due: notice and an opportunity to be heard

The Ninth Circuit's opinion in Mendoza addresses most squarely the question of

what process was due plaintiff.  In that case, the court reasoned that limiting due process to a

hearing after the watch is not sufficient because "[b]y this time... [the inmate] ha[s] suffered all

/////

/////

/////

/////

the indignities the watch demands," id. at 1431, and laid out the process due a prisoner on

contraband watch:

> The prisoner is entitled to notice of the reason for being placed on the watch, and an opportunity to respond in writing, within a reasonable time after the commencement of the watch. No formal hearing is required, but the prisoner's response must be given some consideration. The failure to provide this minimum level of due process violates the procedural due process rights of an inmate placed on the dry cell watch.

Id. See also Hewitt v. Helms, 459 U.S. 460 (1983); Toussaint v. McCarthy, 801 F.2d 1080 (9th

Cir. 1986).

First, then, plaintiff must have received at least informal notice of the reason he

was being placed on contraband watch. Contrary to his claim in his amended complaint that he

was "not told why he was placed on contraband watch, and given absolutely no notice," Am.

Compl. at 26, plaintiff testified at deposition he was informed about prison officials' suspicion

that contraband had been introduced through a visitor on the same night Ms. Richard visited him:

> a lieutenant... interviewed everybody that was in the visiting room that night that they searched our cells and explained what the situation was, and he told us that... they thought that somebody's visit was introducing drugs into the prison through a hairpiece, a wig....

Defs.' Ex. L at 22:2-9. By his own account, plaintiff's interview with a prison official was

sufficient to meet the notice requirement of Hewitt, Toussaint and Mendoza.

Next, plaintiff must have been given the opportunity to voice his views about

being placed on contraband watch, within a reasonable time after the watch commenced and

before it ended. See Mendoza, 960 F.2d at 1431. Also, "the prisoner's response must be given

some consideration." Id. Hewitt requires that the inmate's views be presented "to the prison

official charged with deciding whether to transfer him. . . . So long as this occurs, and the

decisionmaker reviews the charges and then available evidence against the prisoner, the Due

Process Clause is satisfied." Hewitt, 459 U.S. at 476.

/////

Plaintiff states in his amended complaint that he "protested.... that the potty-watch/contraband watch was illegal" and that he "asked [prison officials] to x-ray him instead." Am. Compl. at 18. He alleges that Acting Facility Captain Schroeder relayed the request for an x-ray to Mandeville and Rosario, both of whom refused it. See id. at 18-19. Defendants point to plaintiff's deposition testimony on this issue as an acknowledgment from plaintiff that he "was able to speak with Acting Captain Schroeder and Sergeant Garcia, and to express his views about his placement on contraband watch." MSJ at 15 (citing Ex. L at 33-35). But plaintiff's expression of his views to Schroeder and Garcia is dispositive of the due process claim only if Schroeder or Garcia was the "decisionmaker" who, under Hewitt, must consider the inmate's objections to being placed on contraband watch. Neither side has provided evidence that Schroeder or Garcia made the decision to institute contraband watch, although plaintiff has made clear his belief that Captain Mandeville and Acting Warden Rosario were in charge of his placement there.[14] Indeed a reading in context of the deposition excerpts defendants cite shows that plaintiff's exchanges with Schroeder and Garcia could be evidence that Mandeville was the official in control of his placement on contraband watch – i.e., the "decisionmaker" who matters for purposes of the due process analysis under Hewitt:

> Q.      . . . How do you know that Captain Mandeville made these statements or orders?
>
> A.      Garcia and Captain Schroeder, who was acting captain at the time... both of them told me.
> Every time I asked to X-ray, which was quite a few times, Schroeder called and he called Captain Mandeville. They weren't shy about coming back and telling me. That will be one of my witnesses, Schroeder and Jerry Garcia.
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

/////

/////

---

[14] The allegations of the amended complaint do not implicate any of the other named defendants in the due process claim as it relates to plaintiff's placement on contraband watch and his right to have his views heard during his stay there. Therefore summary judgment in favor of defendants Rasmussen, Davis, Case and Rodriguez is appropriate on that claim.

> Schroeder, he wasn't shy about telling me that Mandeville
> said let him sit there and suffer. So that is how I found out about
> it.
> Schroeder is a witness. I have got to subpoena him, but he
> will be subpoenaed, and Jerry Garcia is another one. He made a
> direct call to Mandeville and Mandeville told him no X-ray, sit
> there the whole time.

Defs.' Ex. L at 33:19-35:8. In addition to this deposition testimony, an affidavit from another

inmate supports plaintiff's theory that Mandeville was making decisions about plaintiff's status

on contraband watch and was refusing to allow an x-ray. See Pl.'s Ex. O (Affidavit of Louis

Hayes).[15]

Plaintiff's averments that Mandeville was the "decisionmaker" and that

Mandeville heard, at least indirectly from Schroeder or Garcia, plaintiff's objections to

contraband watch and his x-ray request would meet the due process minima – except that

Mandeville denies he gave the order to put plaintiff on contraband watch in the first place. See

Defs.' Ex. H ¶ 3. Mandeville goes on to say that such a decision is normally made by "high

level officials in the facility where the inmate is housed." Id. Schroeder was the Acting Facility

Captain at the time. See Defs.' Ex. F ¶ 3. For his part, Schroeder does not say who ordered the

contraband watch, even though the order meant he would have the responsibility to oversee the

watch on his facility. Instead, he says he "recall[s] generally that [plaintiff] was placed on

contraband watch" but does "not recall any specific details." Id. ¶ 3. He also "do[es] not recall

having a conversation with Mandeville suggesting that inmate Chappell be released from

contraband watch on the condition that he take an x-ray." Id. ¶ 6. Acting Warden Rosario says

he "do[es] not recall directing or authorizing Chappell to be placed on contraband watch."

Defs.' Ex. I ¶ 3.

The identity of the official in charge of putting plaintiff on contraband watch

should not be a difficult showing for defendants to make; March 31, 2009 they are, after all, in a

---

[15] See note 10 supra.

much better position than plaintiff to find out.[16]  Defendants attempt to put the onus of their

confusion on plaintiff, arguing that no due process claim can stand because "[p]laintiff has...

failed to establish that either Mandeville or Rosario was the decisionmaker who placed him on

contraband watch."  MSJ at 15.  But plaintiff does not have to conclusively establish who placed

him on contraband watch at this stage of litigation; he need only show a genuine dispute of fact

about it.  Taken together, his own deposition testimony and the affidavit from inmate Hayes

create a reasonable inference that Mandeville was the official who ordered the contraband watch

and therefore was the person who should have heard plaintiff's complaints and objections about

it.

As for defendant Rosario, his affidavit does not address plaintiff's allegation that

he refused plaintiff's x-ray request, and it too is equivocal about the identity of the

"decisionmaker."  However, defendants' briefing is more suggestive than Rosario's affidavit

/////

/////

/////

/////

/////

---

[16] Plaintiff has testified he saw prison officials making due record of his contraband watch in a log book:  "[a]nything that happened in that cell with me they would document it...."  Defs.' Ex. L at 41:16-17.  Defendants do not refute this testimony.  Yet when plaintiff specifically requested discovery of "all documentation that shows who ordered Plaintiff placed on contraband watch," defendants responded that "[a]fter a reasonable inquiry and diligent search, Defendants do not have possession, custody or control of documents responsive to this request."  Pl.'s Ex. I (Defs.' Opp'n to Pl.'s First Request for Production of Documents) at 2 (No. 1).  They also could not produce anything in response to plaintiff's request for "a copy of that contraband watch log book signed by each of those officers who watched plaintiff...."  Id. (No. 2).  Having misplaced their own documents, defendants cannot now transform that institutional failure into an argument for summary dismissal of plaintiff's due process claim.  See LaBounty v. Coughlin, 137 F.3d 68, 72 (2nd Cir. 1998) (vacating summary judgment because defendants' failure to produce documents precluded inmate from presenting evidence of his civil rights claim).

1 about his role and the chain of command that might have been observed in placing plaintiff on

2 contraband watch:

> Defendant Mandeville, as the ISU Captain, conducted an
> investigation into suspicious circumstances surrounding the
> discovery of a wig near the visiting room. He provided this
> information to the Warden's office and custody staff for them to
> take proper action. Warden Rosario acted on the information from
> the investigation as he believed was reasonably necessary to
> preserve institutional security and to determine whether Plaintiff
> was secreting drugs in his body.

8 MSJ at 21:26-22:3. Although this is tantamount to saying Rosario was the all-important

9 "decisionmaker," there is no evidence to support this conclusion. Rosario has no memory of it,

10 and defendants have represented they do not have any documentation showing who ordered the

11 watch.

12      Without conclusive evidence, the court can find only a factual dispute as to

13 whether Captain Mandeville or Acting Warden Rosario or someone else acted as the decision

14 maker and whether that person gave plaintiff's objections the consideration required by Hewitt

15 and Mendoza. The motion for summary judgment as to the due process claim, insofar as it

16 relates to plaintiff's placement on contraband watch and whether his views about it were heard,

17 should be denied.

18                3.    Allegedly false disciplinary report

19      Plaintiff alleges that in retaliation for a previous grievance he filed, defendants

20 Mandeville, Rosario, Rasmussen, Davis and Case fabricated a disciplinary report against him.

21 The allegedly false report arose from plaintiff's refusal to submit to a urine test while he was on

22 contraband watch, something plaintiff does not deny doing. Instead, plaintiff challenges the

23 insertion of the following sentence into the disciplinary report: "Chappell was ordered to submit

24 to urine testing as a result of cocaine residue being discovered on panty hose and a wig

25 belonging to Chappell's visitor." Pl.'s Ex. Q. The reporting officer, Defendant Rasmussen, later

26 stated in plaintiff's disciplinary hearing he did not write that part of the report, even though he

signed the report.  Id.  Rasmussen also stated in writing that "[t]he individual who added this section of the report is unknown."  Id.  Because of this deficiency in the report, the senior hearing officer found plaintiff not guilty of any rules violation.  Plaintiff suffered no adverse disciplinary action as a result of the report.  Id.

The filing of a false disciplinary report against an inmate is not a civil rights violation per se.  It is the basis of a cause of action only if (1) there is evidence that the false report was retaliatory, or (2) the inmate is not afforded procedural due process in the hearing on the disciplinary charge.  See Tunstall v. Yentes, 2006 WL 1748398 at *2 (E.D. Cal.) (citations omitted).  Here, there is no evidence in the record that the allegedly false disciplinary report was written in retaliation for an earlier grievance.  In fact, there is no evidence that the allegedly false disciplinary report was even false.  Plaintiff does not contest that he refused to give a urine sample.  Although the "panty hose" referenced in the report were later determined not to belong to Ms. Richard, and even though Rasmussen admitted to signing a report that contained information he did not document or observe himself, the statement about the reason for the urinalysis accurately states the prison's suspicion at the time.  Nor is it of any moment that the author of the statement is still anonymous.  Plaintiff's refusal to submit to a urine test, not the wig-and-pantyhose incident, is the subject of the report.  Finally, plaintiff received all the process he was due in the hearing, as evidenced by his notice of the hearing, his appearance there, his ability to call Rasmussen as a witness and his acquittal "in the interest of justice."  Pl.'s Ex. Q; see Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974) (prisoner brought up on disciplinary charges is due: (1) written notice at least twenty-hours prior to the proceeding; (2) the right to appear at the proceeding; (3) the right to call witnesses and present documentary evidence; and (4) a statement of the reasons for the disciplinary action taken).  There is no genuinely disputed issue of fact on this claim.  Therefore defendants' motion directed to it should be granted.

/////

4.     No standing for claims related to actions allegedly taken against Ms. Richard

Plaintiff alleges his due process rights were violated when defendant Rosario suspended the visitation privileges of Ms. Richard, plaintiff's fiancée.  Plaintiff does not have standing to assert a claim based on the suspension of a non-party's visitation privileges.  See Mendoza, 960 F.2d at 1433.  Furthermore, plaintiff has no due process right under the Fourteenth Amendment to unrestricted visitations.  See Torricellas v. Poole, 954 F.Supp.1405, 1414 (C.D.Cal. 1997).  Defendant Rosario's motion with respect to claims based on his decision to restrict Ms. Richard's visiting privileges should be granted.

Plaintiff also does not have standing to proceed on his allegations that defendant Rodriguez harassed, "stalked" or otherwise interfered with Ms. Richard outside the prison.  See Am. Compl. at 24-25.  Even assuming those allegations to be true, plaintiff cannot rest a claim for relief premised on somebody else's right to be free from such interference.  See Powers v. Ohio, 499 U.S. 400 (1991).  Plaintiff brings this claim under the Eighth Amendment, making a novel theory of cruel and unusual punishment that is not supported by any case law.  Under any theory of civil rights recovery, though, the claim must fail for lack of standing.  Defendant Rosario's motion to this extent also should be granted.

C.     Qualified immunity

Defendants Mandeville and Rosario also argue they are protected from the surviving Eighth and Fourteenth Amendment claims by qualified immunity.

Government officials performing discretionary functions generally are shielded from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In determining whether a governmental officer is immune from suit based on qualified immunity, a court considers two questions.  One question is, taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

right? Saucier v. Katz, 533 U.S. 194, 201 (2001).  Another question is "whether the right was

clearly established."  Id.  "If the law did not put the [defendant] on notice that [his] conduct

would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Id.

at 202.  These questions need not be answered in any particular order: the Supreme Court has

recently receded from Saucier by providing that the two-step procedure it mandated should not

be regarded as an inflexible requirement.  See Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808

(2009).  Courts may now exercise discretion in determining which of Saucier's two prongs to

address first in light of the circumstances of a particular case.  See id.  In these findings and

recommendations, the court has exercised its discretion and addressed the prongs in the

traditional order set forth in Saucier.

Defendants argue "[t]here is no clearly established law prohibiting prison officials

from conducting the kind of contraband watch procedures used at CSP-Sac, particularly when

the evidence, as here, presents officials with a reasonable suspicion that the inmate was secreting

drugs."  MSJ at 21.  As discussed above, the invocation of "reasonable suspicion" is inapposite

in the context of an Eighth Amendment claim challenging conditions of confinement.  As to the

constitutionality of the conditions of the challenged contraband watch, the court has found that,

taking the evidence in the light most favorable to plaintiff as required, plaintiff has a chance of

proving the conditions did violate the Eighth Amendment.  As to whether the law on this subject

was clearly established, the court finds that it was.  The defendants' argument that "the kind of

contraband watch used at CSP-Sac" has not been clearly prohibited is not dispositive.

Decisional law need not proscribe the exact conduct in question; it need only make the

unlawfulness of the conduct apparent.  See Hope v. Pelzer, 536 U.S. 730, 739 (2002).  Thus the

"kind" of contraband watch put in place here is not the key issue.  Rather, the constitutionality of

the conditions endured by plaintiff must be the focus of the inquiry, along with whether those

conditions had, by April 2002, been clearly established as violative of the constitution.

/////

If the lack of a mattress were the sole condition challenged, the availability of qualified immunity would be a very close question because, as acknowledged above, courts have split on the question of whether the deprivation of a mattress by itself comprises an unconstitutional condition of confinement. See note 8 supra. On the other hand, the constant illumination on CSP-Sac's contraband watch by itself suffices as a clearly established constitutional violation. See, e.g., Keenan, 83 F.3d at 1090. But the apparent violation here accrued in the combination of conditions creating an environment of sleep deprivation to the point of psychological harm: constant illumination, no mattress, waist and ankle chains. It was well established at the time of plaintiff's contraband watch that conditions causing sleep deprivation amount to a violation of the Eighth Amendment. See id.; see also Harper, 174 F.3d at 720. It also was well established by the Supreme Court in Wilson that a constitutional violation occurs when conditions "have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise – for example, a low cell temperature at night combined with a failure to issue blankets." Wilson, 501 U.S. at 304-05. As discussed above, the conditions in this case had the mutually enforcing effect of sleep deprivation that any reasonable officer would know comprised unconstitutional conditions of confinement. Therefore defendants Mandeville and Rosario are not eligible for qualified immunity in the face of plaintiff's Eighth Amendment claim.

Defendants Mandeville and Rosario also are not protected by qualified immunity against the due process claim. Plaintiff's right to due process, and specifically the requirements of notice and an opportunity to be heard within a reasonable time after the commencement of contraband watch, were established by Hewitt, Toussaint and Mendoza by the time his claim accrued. Although there is no material dispute that plaintiff received notice about the reason for his placement on contraband watch beforehand, the defendants have failed to show he also was heard by the "decisionmaker" within a reasonable time after his placement there. Defendants' inability to identify the "decisionmaker" is their main obstacle in succeeding on their motion

against the due process claim. But whoever the "decisionmaker" might have been, there is no question that any reasonable prison official in his or her position would have known that plaintiff's views about his placement on contraband watch had to be given their due consideration.

IV.   Conclusion

Based on the foregoing, defendants' motion for summary judgment should be granted in part and denied in part as recommended below.

IT IS HEREBY RECOMMENDED that:

1.   Defendants' motion for summary judgment (docket entry 105) be resolved as follows:

A.  Granted as to defendants Mandeville and Rosario on the Eighth Amendment claim for excessive force based on the use of too-tight shackles and taping;

B.   Denied as to defendants Mandeville and Rosario on the Eighth Amendment claim for unconstitutional conditions of confinement while plaintiff was on contraband watch;

C.   Denied as to defendants Mandeville and Rosario on the Fourteenth Amendment claim for violation of due process as to plaintiff's placement on contraband watch and his right to express his views to the appropriate person while on contraband watch;

D.  Granted as to defendants Rasmussen, Davis, Case and Rodriguez on the Fourteenth Amendment due process claim as to plaintiff's placement on contraband watch and his right to express his views to the appropriate person while on contraband watch;

E.  Granted as to defendants Mandeville, Rosario, Rasmussen, Davis, Case and Rodriguez on the Fourteenth Amendment due process claim with respect to the allegedly false disciplinary report; and

F.   Granted as to defendants Rosario and Rodriguez on any claims on behalf of Philissa Richard.

2. Plaintiff be ordered to file his pretrial statement within thirty days of any adoption of the foregoing recommendations. Defendants Mandeville and Rosario be ordered to file their pretrial statements within thirty days of service of plaintiff's statement.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within ten days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: March 31, 2009.

_____
U.S. MAGISTRATE JUDGE

4
chap0653.57